I have to start by recognizing this is a historic occasion. I'm certain that Circuit Judge O'Malley will serve the United States in this court for many decades, but this happens to be the first time she will do that, and we welcome her with great enthusiasm. Thank you. Our first case this morning is UNIGENE v. APOTEX. This is Mr. Pocatillo. Pocatillo, Your Honor. Pocatillo. Thank you. Good morning, Your Honors, and welcome to the court. Thank you. My name is Manny Pocatillo. I'm here with Mark Bassler, and we represent the defendants, APOTEX Inc. and APOTEX Court. I'd like to cover this morning the error that the District Court judge made in granting summary judgment, denying the crime fraud motion, and dismissing claims 12, 13, and 14 of the counterclaims in the District Court. We believe Claim 19 is invalid under 35 U.S.C. Section 103, based on the prior art in the case. The prior art is essentially the liquid nasal formulation for osteoporosis, which is known as myocalcin. Myocalcin basically has two main ingredients. Salmon calcitonin is the active ingredient. But the substitution for that in this claimed invention is a rather complex and precise mixture of three or four different components, two alcohols, a specific amount of citric acid, and polysorbate 80. It would be almost unprecedented for us to find that you mix three things together to substitute for one, and that's obvious. Well, Your Honor, there are cases where several compositions having the same function have been replaced for a single composition. We've cited those cases, Your Honor. In addition, I call your attention to the fact that in the Eastside case, which you decided, you noted that In re Dillon makes it known that you can replace those compositions with compositions having the same function. But in each of the three functions you're replacing, there would be multiple choices in each of those three categories. And yet they have selected a specific group which seems to work extremely well. Your Honor, it was well known to the plaintiff and to the public that the citric acid performed two functions. It's a buffer, but it also increases bioavailability by virtue of the fact that it is concentration dependent. As you increase the concentration of citric acid in the 014 patent, it is clear from that patent, which is Dr. Stern's own patent, which he was a joint inventor in. And it shows specifically that there is an increase in calcitonin bioavailability. The 315 patent arguably teaches away as well. And so when the lower court is considering the motivation to combine all of these, the 315 patent, while it does actually use citric acid in the exact amount, doesn't it expressly indicate it's not for the same function as you're suggesting it would perform? Your Honor, that's what the patentee stated in that. But that doesn't mean because it stated that it wasn't being used as the preferred calcitonin enhancer, doesn't mean that it wasn't actually doing just that function. For example, not only the citric acid, but in this case, the Tween-80, when it's used with a calcitonin enhancer like citric acid, further enhances the bioavailability, and that's taught in the 014 patent. The fact is that in this case, Your Honor, all of the components were known, and there's only a limited number of components that could have been used as the elements in an intranasal spray. Can I just ask you for clarity purposes? Because one of the things I found a little difficult about the briefing was that you didn't tell me which most obviousness cases do. This is obvious in light of blank and blank. So just so I understand exactly which references amount to the combination that you say is going to render obvious. So I understand your primary reference or primary prior art is the myocalcin. Am I not pronouncing that right? It is myocalcin. Myocalcin, right. So your primary reference or your primary thing that you're saying this is obvious in light of prior art is myocalcin in combination with what? Myocalcin in combination with the 014 patent and the day reference. How do you rely on the 014 patent here when it went back and looked at your summary judgment motions? You don't even cite it in your summary judgment motions. And the transcript of the hearing before the judge, you mention it in passing. So how do we get to the 014? Yes, it was the subject of the crime fraud ruling, but it was never cited in your motion with respect to or in your papers as it relates to obviousness. Your Honor, please understand that in this case, in the crime fraud motion, the judge specifically negated the 014 patent as being a material reference or even relevant because of the fact that he did not consider the fact that it was shown for use in an oral dosage as opposed to an intranasal dosage that was in this case. The myocalcin, not the myocalcin. But that enhances the teaching away points that Judge Moore was talking about, doesn't it? It makes it unlikely that it would be resorted to by one of skill in the art. It would absolutely be resorted to by one of skill in the art. And what prior art teaches 20 mm of citric acid? Mark, could you find that for me? My co-counsel will find that for Your Honor. But just because the judge found that the 014 I think it's Grebo. Grebo shows 20 mm. Just because the judge found that the 014 was not material in its crime fraud ruling doesn't mean that you don't have an obligation to raise it in your obviousness arguments if you think that's pertinent to your obviousness. Well, Your Honor, in the summary judgment motions, we relied on the declarations of Drs. Klybanoff and Dr. Mitra. And both mentioned the fact that the 014 patent is in fact relevant and shows that it increases the bioavailability of the salmon calcitonin. And the thing is to remember is that what the 014 patent showed, which the district court ignored, is the fact that a liquid calcitonin composition with citric acid was injected directly into the duodenum of a rat. Because of the fact that it was directed, the 014 patent is directed to oral dosages that are in a powder form, he did not consider that to be a liquid formulation. But in fact, the patent actually teaches that. It teaches that it goes through a mucosal membrane just as you have to go through a mucosal membrane when you apply intranasally. A person of ordinary skill in the art would not be confused by the fact that that is a teaching that is extremely important to the use of… You're adding and adding and adding to the number of things one of skill in the art has to do. When I mentioned the 20 millimolars, you added another piece of prior art. It isn't just day and the 014, you have to get the reboot too. And you have to then modify each of those so that they're not just stomach, but they also apply in the nasal. You're up to about four things that one of skill in the art would have to put together and have some motivation to put together. But Your Honor, there is motivation. The myocalcin was on the market. It was FDA approved. It was covered by the Ezria patent, which specifically has a claim to benzylconium chloride in combination with calcitonin. That is the motivation for replacing the benzylconium chloride. A person of ordinary skill in the art, Your Honor, would know that you want to have the same bioavailability for the FortiCal or the CLAIM-19 as you have for the myocalcin. We showed in the prior art, we showed in the pleadings that that is exactly what was done in this case. Just to add to it, calcitonin is notoriously unstable. And how do you know exactly that these three things that you're substituting for BZK are not going to disrupt that stability? Your Honor, the fact is that two of the things were used together in connection with the 014 patent. Both citric acid and tween 80 were used in one of the formulations in the 014 patent. Not in the same concentration, and that was a stomach administration, not a nasal. That is correct, Your Honor. But it does teach. We haven't even gotten yet to the two alcohols. And why do you select those two? The benzyl alcohol and the phenol ethyl alcohol were both known as preservatives. How many other things are known as preservatives? Thousands? No. That had been approved in nasal formulations. It's very few. They're all in the day reference, and the day reference specifically shows that there is that the ‑‑ if you go to A11397, you'll see a table of excipients that were used in aqueous nasal products which had been FDA approved in 1999. It is not a long list. The number of preservatives that are there are 1, 2, 3, 4, 5, 6, 7, 8, 9 preservatives. And you can see also that that same list also shows that there were only three surfactants that had been approved at that point. Nine times nine, that's 81 different options they could have had just off that list? But, Your Honor, the thing is, both benzyl alcohol and phenol ‑‑ We have to make 81 different choices there. We have to deal with the stomach versus the nasal. We have to deal with 20 millimolars, bringing in a different reference. We have to deal with polysorbate teaching away. That supposedly reduces the effectiveness of alcohol. All of this flurry of information you think is obvious. Yes, Your Honor, and it wasn't a teaching away. It was just an observation that it was not as effective as another drug. But that's not correct, is it? The 315 actually said that it won't work. No, it does not say that, Your Honor. It will serve that particular function. Not that it's not the preferred stabilizer, but that it won't work as a stabilizer. I apologize, Your Honor. I don't believe it does say that, Your Honor. It does not say it will not work. It just says it wasn't used for that purpose. That's all it says. And for all we know, it may have been serving that purpose, and it probably did because that's the inherent property of citric acid to cause the increase. And the fact is ‑‑ But wasn't the whole point of the 315 to find an appropriate stabilizer, shelf stabilizer? And they concluded that citric acid couldn't serve that function? It didn't conclude that, Your Honor. I don't believe it did. I think it specifically says it was not being used for that purpose. That's all. And to me, that is not what I believe you're saying. Okay. Counsel, just so we can go back for a second, because in answer to my earlier question, you said that the three things you have to combine to get to the claimed formulation are myocalcin, the 014, and day. Right? Correct, Your Honor. Now, I'm looking at the day thing that you pointed to, and it does disclose, as the exhibients, the benzyl alcohol and the phenylethyl alcohol. Phenylethyl. But it doesn't disclose any concentration range for benzyl alcohol. And for phenylethyl alcohol, it discloses a concentration range, which maybe somebody could say is about 0.2. It's 0.25 percent. So maybe that could get you there for that. But for benzyl alcohol, it doesn't disclose any range. Now, since that's not disclosed in 014 or myocalcin, where do we get the range for that? Those are shown in many patents, Your Honor. But so then it isn't just these three things that would render obvious. So what is the other thing I'm supposed to add to it? I can't just say it's shown in many patents. That's not good enough. You want to render this obvious, I have to know what pieces of prior art to combine. This is the problem I have with your briefs, is that I couldn't figure out what exact combination you were saying rendered it obvious. If the PTO came up to us on appeal and said, well, these are just obvious. It's shown in many places. I couldn't accept that from them. I can't accept it from you either. Your Honor. So what specific reference brings me to that conclusion? The references that we cited in our brief, Your Honor, they are in our brief. Which one? Can you tell me? Because I want your best answer as to exactly which combination renders these claims obvious. Your Honor, it was really routine testing that would bring you to the result of all these, the numbers, the percentages you used. It's just routine testing. If I may, Your Honor, I would just like to point out the equivalence of putting a house together. The mere fact that you may not know what specific number of nails and screws and pieces of wood that you're going to put together for a house doesn't make that house not obvious to make. Well, it does when someone claims the specific number because then they get an incredibly narrow claim. They don't get a claim to a house. They get a claim to a house with 367 nails, 527 planks of wood, and that makes it easier for you not to infringe because that claim is so narrow. So, yes, you do have to show those numbers to render it obvious. But, Your Honor, even if you didn't show that each of the – there were any prior art references for that specific house, you would still not give it a patent because it didn't do anything that wasn't obvious. What expert testimony did you rely on in front of the district court? Klibanoff, Mitra. Tell me what they said. Tell me where because I can't find specific statements that say the things that you're asking us to confirm. Okay. Let me just show you. Klibanoff. And they have to be statements that you cited to. They were, Your Honor. Dr. Klibanoff's testimony, A2432. Table 2 of the 014 patent shows the effect of citric acid. Increasing the concentration of citric acid from 9.6 milligrams to 48 milligrams resulted in approximately tenfold increase in bioavailability. But even if he said that, where did you cite to that in your motion? Oh, you're talking below? Yes. I mean, we can't consider it here if you didn't cite it below. But, Your Honor, if you take a look at the case that we cited, that shows that when you've argued something and it's been rejected in an earlier proceeding, it becomes the law of the case and you can't argue it again with the same judge. And the thing is, that's the reason why we didn't have it in our briefs. I did mention it in my argument, as you said, but the point is it was in the brief. Okay, Mr. Klobuchar, I think your time is well overspent. Let's hear from Mr. Hawes. We'll give you back one minute for rebuttal. Thank you, Your Honor. And give Mr. Hawes 16 minutes if he should care to use that. Your Honors, may it please the Court. First, Judge O'Malley, welcome. From this side of the bench, we're glad you're here. Thank you. Judge Moore, you asked a very interesting question. Please give me your best combination of Art and Mr. Pocatello continued along the line we've had in this case since the very beginning. It's been a moving target since the very beginning of this case. His answer was he combined the 014 patent, which was not argued below, and the day reference, which was hardly argued below, and that would be your reference. Well, everything that was said this morning and everything that was in the briefs of Apotex tries to oversimplify this technology. But wouldn't one of skill in the art, we're dealing with pretty sophisticated people here putting together pharmaceutical compounds, wouldn't they know, okay, this is about the right amount of citric acid, this is about the right amount of alcohol, this is about the right amount of polysorbate? Absolutely. And wouldn't they be able to get to that pretty quickly and easily? No, Your Honor. And the reason is because there's many different factors here. As you understand, this is a very narrow claim, requires specific amounts of five different components. It requires a liquid, number one, and so what is known with how to make a solid may not work with a liquid. It requires a nasal administered drug, which means it has to permeate through the nasal membrane. So what is known with an oral drug or a rectally administered drug or a vaginally administered drug or a buccal or pulmonary doesn't necessarily teach a person either. And one of the things that is so glaringly evident in the absence is the fact that citric acid, the one major component we've talked about, most of the references relied upon by Apotex uses citric acid for a completely different function as a buffer or a pH modifier. So how would a person skilled in the art who even knew about citric acid as a buffer, how would they understand how it might work as an absorption enhancer or a stabilizer? Well, actually, doesn't the 315 patent actually say it can function as an absorption enhancer? It says that in the 315 patent, Keschel said that he tried those absorption enhancers in the long list of Annex and they didn't work well. They didn't work. And in fact, Keschel says that they were disappointing, and that's the word that he used. It was disappointing. So if a person of skill in the art looked at the 315 Keschel patent and saw that those results were disappointing, it certainly wouldn't teach him to go and look at that as an absorption enhancer. You really have to focus on the citric acid, though, don't you? I mean, cycling in fairly well-known preservatives and surfactants is not a big development in the art, is it? For purpose of this argument, you're right, Your Honor. Yes, indeed. And citric acid is a very important part because, as Judge Rader said, it's taking this miocalcium prior art reference, the component benzoponium chloride, which did three things. It was a surfactant, it was a preservative, and it was an absorption enhancer. And instead of replacing it with something that does those things, and there were those available in the art, they go and they replace it with four things, two preservatives, one absorption enhancer, and one surfactant. Well, the thing they choose for an absorption enhancer had never been used as an absorption enhancer in a nasal formulation. In fact, there were far more logical places for a person of skill in the art to go. They could have gone to the art that had multifunctional components. They could have gone to the art that said these things work as absorption enhancers with calcitonin in the nose. They didn't. Instead, they went to these old references where there were 14 broad categories of potential things that could be used for absorption enhancement. Among those 14 things, two of them were quite evident. One was a surfactant, which benzoponium does. And they didn't go there. They went to these chelating agents, which brought them to this Annex patent, which was the 60-plus chelating agents plus their salts. So we're now into hundreds, possibly thousands of choices. That Annex patent didn't even refer to calcitonin. So what their person of skill in the art would have had to do was truly inventive. This was not logical choices along a path that was logical. This is not like the AgraZap case where there was only one component from one piece of prior art. This is not like the Sundance case or even In Re Cubin where it was a predictable solution. Here, any change in any one of those components could have upset the apple cart. No question about it. In fact, there's no references in this art that teaches citric acid as an absorption enhancer. Well, actually, counsel, the 116 patent expressly does at column 2, line 11. The 116 patent, Your Honor, doesn't even mention calcitonin. Yes, but you just said there's no reference that teaches citric acid as an absorption agent. And then liquid nasal calcitonin. Okay, well, you didn't say the rest of that. Okay, I'm sorry, Your Honor. So certainly you agree that the 116 patent expressly lists citric acid as an absorption agent at column 2, line 11. Among at least 60 times the salts, hundreds of other possibilities. And that patent specifically identifies EDTA as the preferable one, and that is a surfactant. So you do agree? Yes, we do agree, Your Honor. Okay, but the 315 patent expressly says look at the 116 patent's list of absorption enhancing agents. Yes, so you start with the 315 patent, which you agree is a nasal formulation, correct? Yes. It discloses salmon calcitonin. It does not. It does not? No, it does not. It doesn't disclose the active ingredient? The 116 patent? No, I'm talking about the 315. Oh, yes, I'm sorry. I may have been confused. Yes, it does. Okay, so you've got the 315 patent. It's a nasal, liquid nasal agent, the same thing as the claim in that regard. It discloses the same active ingredient. It does, Your Honor. It discloses citric acid in the exact amount claimed, 20.5 mm, whatever mm is, right? It does. In one of the examples, it discloses 20.5 citric acid mm, correct? It does, Your Honor. Yes, okay, wait. And it also says, look to the 116 patent, which lists absorption enhancing agents, and one of the things we've already agreed on as listed as an absorption enhancing agent is citric acid in that patent. So why doesn't that close the loop up enough to survive summary judgment? Several reasons. Okay. First, that patent uses citric acid for a different purpose. The 315? Yes. That's used as part of a buffer, as part of a pH modifier. Where does the claim cover functionality? Because I see this as a straight formulation claim, so I'm not sure it should have mattered. I understand they brought it in. They argued, look, you can take the functions of BZK and you can replace with these functions, all this other stuff, and they introduced this functional stuff into this analysis. But at heart, this claim doesn't have any function in it. Well, the point is, is if you were to use the person of skill in the art path that Apotex suggests you take, you do have to consider function, because otherwise there would be no incentive for a person of skill in the art to even get to that patent. And so the answer to that question is it's one, used for a different reason. Two, there's others that are preferred. And even if you take the amount of the 20.5 in one example, there are other examples that are quite different. Yes, but it discloses the exact amount that you claim in this formulation. Well, but it doesn't disclose it for the same purpose, that a person of skill would be looking for this ingredient. Okay, so you've got the active ingredient, you've got a nasal formulation, you've got the exact correct amount of citric acid. Only things you need to add at that point are preservative and surfactant. That's it. It becomes a lot less throwing darts against a wall at that point. It becomes a much more concrete thing. The 315 patent seems to disclose everything but preservative and surfactant, and those don't seem to be the truly novel aspects of this. But the 315 patent also says that they tried the absorption enhancers of the chelators, including the citric acids, and the results were disappointing. And it actually said, as Your Honor pointed out, that that citric acid was not used specifically in the patent. It says it was not used as an absorption enhancer. Mr. Pocatello says just because they said it was not used doesn't mean it worked that way. Well, how does one learn from that? What's the patent exactly say? What's the exact language? Can you direct me to where that teaching away language is? Yes, I can, Your Honor. Column 4, line 20, I think, is where you want to go. Column 4, beginning at line 18, it says it can be seen, quote, that in some of the foregoing examples, citric acid is mentioned. It is, however, to be noted that citric acid was not used as an absorption enhancing agent, but it is merely the acidic component of a buffer. And if you look at column 2, beginning at around line 15, it talks about this Annex 116 patent, and it says, in fact, such absorption enhancing agents disclosed in the 116 patent were unable to assure a suitable stability of the polypeptide active ingredients. And here it says it had been surprisingly found. So that says they're not great for stability, right? That's right. But that doesn't necessarily cover all of the functions. But a person skilled in the art reading this patent would certainly not have incentive to go and pick out citric acid as an absorption enhancer in a nasal formulation. Certainly not when there were far more logical choices, Your Honor, where there had been other agents tested and had worked. But you're starting from the proposition, again, that function matters. And I understand that's the way it's been argued all the way through. But you've got a reference that discloses a good chunk of this claim formulation in exactly the right amounts, and the only things missing are surfactant and preservatives. So at that point, why wouldn't it have been obvious just to take the example given and put in surfactant and preservatives? Because those, certainly the preservatives, don't seem to be anything novel. They seem to be listed and disclosed in many different references. Well, we submit and we think the district court correctly decided that this 315 Keschel patent certainly teaches a way from using citric acid as an absorption enhancer. You keep pointing back to function, but function's not in the claims. There's no function in the claims. Without the function, you wouldn't get to the selection of the various ingredients. That's the whole point of the obviousness and the person of skill in the art path that we have argued from the very beginning is a very torturous path. And because this is such a narrow claim, as Your Honor pointed out, you need not only each of those ingredients, you need them in the amounts that they're given. And certainly we don't think the Keschel patent does that, and we think the district court correctly decided. We also think that the fact that it was a buffer in an amount of 20.5 doesn't teach you would use that same amount if the purpose of your using citric acid was to have absorption enhancer. Myocalcin, as Your Honor probably knows, doesn't have a buffer. So if you're taking Myocalcin as the lead compound and you're trying to replicate it and replace the components, you certainly wouldn't look for a buffer. You wouldn't look for a pH modifier. So the Keschel patent doesn't tell you that. Frankly, we think that there are so many logical paths and so many logical choices, we think the district court got it right when it says this is too complicated to have them prevail even on summary judgment. This patent claim is not obvious. As we pointed out in our briefs, all of this art was before the patent office and reissued. Every single piece, including Keschel, not one of those pieces of art caused the patent office to reject the claims. That presumption after reissue and the presumption that an examiner did her job when she looked at the references should be considered in this context. The prior art doesn't teach the use of 200 millimole citric acid. Certainly, the Annex patent has a 2,000-fold range. The four patents that Apotex relies on uses citric acid as a buffer. How does the amount used as a buffer teach one how much to use as an absorption enhancer? We say it does not. We also say that Apotex, in our view, essentially conceded non-obviousness when it says in its brief when it admits that a person of skill in the art lacks sufficient information to determine without more testing whether this was used as an absorption enhancer. Well, more testing required is simply not enough to warrant an obviousness finding. I would like to spend just a moment, Your Honors, to talk about the other issues that are before the Court. The new inequitable conduct claims, we don't think the District Court abused his discretion in dismissing those counts. In fact, we don't think Apotex even suggests an abuse of discretion here. There were new issues. They came too late. They were after the scheduling order. A court has discretion to control his or her docket, and, in fact, these things came too late and this pragmatically appropriate time that you read in the briefs makes no sense because it's not the facts. Apotex knew about these facts two years earlier than they pled them. They were the subject of the crime-fraud motion, and, indeed, they were never brought in any other pleading. We think the District Court was correct by finding that Apotex's inequitable conduct claims were conceded, waived, barred, abandoned, or improperly raised. That was his decision. One other point I think is important in the decision below on page A75, in footnote 13, the District Court says, the administration of calcitonin in an oral dosage or in a dosage through the cheek, rectum, or vagina or in a dosage in a solid or powdered form is far different from the administration of a liquid dosage nasally, and absorption enhancers that were applicable in such different contexts are not applicable in the liquid nasal context. They have pointed to no error in that statement. Thank you, Mr. Haass. I think your time is up. Thank you, Your Honor, and we urge affirmance in total from the District Court decision. Thank you. Mr. Pocatillo, we've restored a minute for rebuttal. I just would like to point out, Your Honor, that with respect to the house example I gave earlier, just as in the house example, the plaintiff has not shown any unexpected results from the obvious putting together of these functions to replace benzalconium chloride. Throughout the plaintiff's statement, he keeps ignoring the 014 patent of Stern, which shows absolutely that there is a concentration dependence of citric acid in improving the bioavailability of calcitonin. And finally, Your Honor, I just wanted to point out that on page 40 of our brief, we point out that Grebo shows an example where phenolethyl alcohol is used at a concentration of 0.2 percent weight per volume in connection with the myocalcin bioavailability, 20 millimolars. This is exactly what the bioavailability of myocalcin is. It's on page 20 of our main brief. Thank you, Mr. Pocatillo. Thank you, Your Honor. Our next case is Andre versus the Department of Veterans Affairs.